**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MARINA E. KARADI, Individually and
the State of North Carolina ex rel
Marina E. Karadi,
                     *Plaintiff-Appellee,*

v.

H. D. JENKINS, Deputy Sheriff of
Wake County, in his individual and
official capacities; JOHN H. BAKER,
JR., Sheriff, in his official capacity
as Sheriff of Wake County; THE
NORTH RIVER INSURANCE COMPANY, a
Corporation licensed to do business
in NC,
                     *Defendants-Appellants,*

                     and

DILLARD'S INCORPORATED, a
Delaware Corporation,
                     *Defendant.*

No. 00-1300

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
W. Earl Britt, Senior District Judge.
(CA-98-709-BR(2))

Argued: January 23, 2001

Decided: April 3, 2001

Before WILLIAMS and MICHAEL, Circuit Judges, and
Claude M. HILTON, Chief United States District Judge
for the Eastern District of Virginia, sitting by designation.

Reversed and remanded with instructions by unpublished per curiam opinion.

---

**COUNSEL**

**ARGUED:** Kerry Anne Shad, SMITH, ANDERSON, BLOUNT, DORSETT, MITCHELL & JERNIGAN, L.L.P., Raleigh, North Carolina, for Appellants. Michael Wood Clark, PIPKIN, KNOTT, CLARK & BERGER, L.L.P., Raleigh, North Carolina, for Appellee. **ON BRIEF:** Zebulon D. Anderson, SMITH, ANDERSON, BLOUNT, DORSETT, MITCHELL & JERNIGAN, L.L.P., Raleigh, North Carolina, for Appellants.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

This appeal arises in relation to Officer H.D. Jenkins's seizure of a shopper, Marina E. Karadi, for suspicion of shoplifting.[1] Jenkins appeals the denial of his motion for summary judgment based upon his qualified immunity defense. The district court held that Jenkins unreasonably seized Karadi in violation of her clearly established Fourth Amendment rights and, therefore, that Jenkins was not entitled to a defense of qualified immunity. Because Jenkins's seizure of Karadi did not violate clearly established federal law, we vacate the

---

[1]Jenkins is a Deputy Sheriff of Wake County, North Carolina who was working in Dillard's department store as a private security guard. Karadi does not contend that Jenkins was not working in his capacity as a police officer at the time of the incident and that he, therefore, is not entitled to qualified immunity. Thus, to the extent such an argument was available, it has been waived.

judgment of the district court and remand with instructions to enter judgment in favor of Jenkins. Further, because all of the federal claims have been rejected, we direct the district court to dismiss without prejudice the remaining state law claims.

I.

A.

Because this is an interlocutory appeal from the denial of qualified immunity on summary judgment, we accept Karadi's version of the facts surrounding the incident as true.[2] *See Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992). On August 27, 1997, Karadi was shopping at the Dillard's department store in the Cary Towne Center in Cary, North Carolina. Karadi purchased several items in the Baby Department. These items were placed in a Dillard's bag. Karadi then purchased a bathing suit in the Boys' Department, which was placed in a separate Dillard's bag. Karadi next purchased four pairs of shoes from the Shoe Department, which were placed in a third Dillard's bag. Karadi then asked an associate of the Shoe Department to hold two of her bags while she went upstairs to customer service to obtain gift boxes for her baby items. Karadi stopped to browse in the Juniors' Department on the way to customer service, then holding only one Dillard's bag. Kristin Harrison, a sales clerk assigned to the Juniors' Department, observed Karadi while she was browsing. At customer service, Karadi received several gift boxes, which were placed in a fourth Dillard's bag. Immediately after she obtained her gift boxes, Karadi went back downstairs to the Shoe Department, where she retrieved her other two bags and proceeded to the exit carrying all four bags.

As Karadi neared the exit, Harrison yelled for Karadi to stop, exclaiming, "Ma'am! Ma'am!" Harrison then asked Karadi if she had been in the Juniors' department, stated that Harrison had seen her there with one bag and Karadi now had four bags. Karadi perceived

---

[2]Jenkins does not contest Karadi's version of the facts for purposes of this appeal, giving us jurisdiction to resolve his qualified immunity defense at this interlocutory stage. *See Johnson v. Jones*, 515 U.S. 304, 311, 319-20 (1995).

this as an accusation that she had shoplifted, and she demanded to see a manager. Harrison obliged Karadi's request and left to locate one of the floor managers, Shana Sund. Upon being notified of the developing problem, Sund requested that Jenkins accompany her and Harrison, stating, "There's a situation that may need your assistance, I believe, that may be going bad." (J.A. at 764-65.) While walking to meet Karadi, Harrison told Jenkins that she had observed Karadi in her department with only one shopping bag and, a very short time later, she had in her possession four bags.

When approaching Karadi, Jenkins and Harrison remained behind while Sund asked Karadi to explain the situation. Karadi informed Sund that Harrison had accused Karadi of shoplifting and stated, "[i]f you feel I have shoplifted, feel free to open—open my bags and look." (J.A. at 270.) During her deposition, Karadi testified that Sund did not respond to this demand because Sund was "taken back" and "didn't know how to react." (J.A. at 279.) Not knowing that Sund was a manager, Karadi continued to demand to see a manager.

Observing that Karadi was becoming upset and that the situation was escalating, Jenkins approached Karadi and asked her to explain what had happened. Instead of explaining the situation, Karadi continued to demand that her bags be inspected and continued to demand to speak to a manager.

Believing the tension was escalating, Jenkins then requested Karadi to accompany him to a different part of the store for the purpose of conducting the investigation in private, and Karadi refused his request. At that point, Jenkins "grabbed" her arm with his hand to attempt to move her. (J.A. at 287.) Karadi testified that she then tried to push his hand off her arm several times in an effort to "get free of his grip." (J.A. at 291.) At that point, Jenkins squeezed Karadi's arm and pushed her away from the store exit towards the elevator in the Men's Department. Karadi became more upset and began crying. Perceiving Karadi as continuing to resist his efforts to move her, Jenkins put Karadi against the wall and handcuffed her arms behind her back. Karadi alleges that Jenkins's forcefulness during this exchange bruised her arms, requiring her to seek medical treatment.

After removing Karadi to Dillard's security office, Jenkins compared the items in the bag with those on the receipt. Jenkins testified that his investigation of his suspicion of shoplifting ended upon the comparison of the merchandise to the receipts. After concluding his shoplifting investigation, Jenkins removed Karadi's license from her purse and left the room to begin processing Karadi for misdemeanor criminal charges of resisting, obstructing, and delaying a public officer and intentionally causing a public disturbance.[3]

After making the appropriate phone calls to his supervisors to process the charges against Karadi, Jenkins returned to the security office and, at Karadi's request, removed her handcuffs. He then explained to Karadi why she had been detained and began filling out her criminal citations. According to Karadi, when Jenkins attempted to obtain personal information from Karadi to complete the citations and she did not give it to him, Jenkins grabbed Karadi's arm and jerked her onto a chair and shouted obscenities at her. Jenkins ultimately cited Karadi with a charge of resisting, obstructing, and delaying a public officer and a charge of intentionally causing a public disturbance.

B.

On August 12, 1998, Karadi filed suit in Wake County Superior Court against Dillard's Inc.; Jenkins, in his individual and official capacities; John H. Baker, Sheriff of Wake County, in his official capacity; and the North River Insurance Company. After removing the case to the United States District Court for the Eastern District of North Carolina, Western Division, the defendants filed motions for judgment on the pleadings.

On April 19, 1999, the district court granted Dillard's motion to dismiss all claims against it. The district court also granted dismissal

---

[3]Under North Carolina law, it is unlawful to "resist, delay, or obstruct a public officer in discharging or attempting to discharge a duty of his office." N.C. Gen. Stat. § 14-223 (1999). North Carolina law also prohibits "conduct creating the threat of imminent fighting or other violence" or "any utterance, gesture, display or abusive language which is intended and plainly likely to provoke a violent retaliation and thereby cause a breach of the peace." N.C. Gen. Stat. § 14-288.4(1) & (2) (1999).

with respect to Karadi's Fourteenth Amendment and § 1983 claims against Jenkins in his official capacity, her claims based upon the North Carolina Constitution, her punitive damages claim against Jenkins in his official capacity, and limited the derivative claims against Baker and North River to the $5,000.00 bond that North River had provided as insurance coverage.

On December 6, 1999, Jenkins, Baker, and North River filed a joint motion for summary judgment with respect to the remaining claims based upon Jenkins's qualified immunity defense.[4] On March 6, 2000, the district court denied this motion.

In this interlocutory appeal, Jenkins challenges the district court's denial of summary judgment pursuant to his defense of qualified immunity. He further challenges the district court's denial of summary judgment as to Karadi's state law claims. We address each argument in turn.

II.

We review the district court's ruling denying qualified immunity de novo. *Hodge v. Jones*, 31 F.3d 157, 163 (4th Cir. 1994). Qualified immunity protects government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In determining whether a government official is entitled to qualified immunity, the steps are sequential; we "'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all,'" before "'proceed[ing] to determine whether that right was clearly established at the time of the alleged violation.'" *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Conn v. Gabbert*, 526 U.S. 286 (1999)).

---

[4]The remaining state law claims against Jenkins are based upon gross negligence, false arrest and imprisonment, malicious prosecution, and assault and battery. The claim against Baker and North River Insurance is one of derivative liability.

## A.

We first address whether Jenkins violated Karadi's Fourth Amendment right to be free from unreasonable seizure when he attempted to move Karadi from the middle of the store to Dillard's security office without her consent. In determining whether Jenkins's actions were justified, "our inquiry is a dual one — whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968).

To "stop and briefly detain a person for investigative purposes," an officer need only have "a reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States. v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotation marks omitted). Before Jenkins approached Karadi, Harrison had informed him that she had observed Karadi with one bag and, seconds later, had observed her with four bags. Harrison told Jenkins that she had stopped Karadi to inquire about the additional bags and, instead of providing an explanation, Karadi demanded to see a manager. An officer may rely on information provided by a known third party to establish a reasonable suspicion that could justify an investigatory stop. *Adams v. Williams*, 407 U.S. 143, 146 (1972) (rejecting argument that reasonable suspicion can be based only on an officer's personal observation and allowing officer to rely upon information provided by a known informant). *But see Florida v. J.L.*, 529 U.S. 266, 269-74 (2000) (holding that an anonymous telephone tip is not sufficient to establish reasonable suspicion, absent suitable corroboration). We agree with the district court that the first hand description of supicious behavior by store personnel provided Jenkins with a legitimate, articulable suspicion sufficient to justify his initial detention of Karadi.

## B.

We next address whether the detention was reasonably related in scope to the circumstances that justified the initial interference. *See Florida v. Royer*, 460 U.S. 491, 500 (1983) ("[A]n investigatory detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."). The district court held that Jenkins's efforts to move his investigation of Karadi to a different loca-

tion exceeded the permissible scope of an investigatory stop under *Terry*. In *Royer*, the Supreme Court held that an officer may not move a suspect from one location to another during an investigatory detention unless a "legitimate law enforcement purpose" supports such a move. *Royer*, 460 U.S. at 505.

Jenkins asserts two law enforcement purposes as legitimate reasons for moving Karadi to another location: (1) to further his investigation; and (2) to prevent a public disturbance. We address each alleged law enforcement purpose in turn.

At oral argument, Jenkins's counsel argued that relocating Karadi furthered Jenkins's investigation because his suspicion was not simply of shoplifting but also of theft from another customer. Were we to accept this characterization of the suspicion, we would agree that moving Karadi to a private room within the store is a reasonable means of furthering the investigation because comparing Karadi's receipts to her merchandise would not dispel the suspicion of theft, in that the suspicion would not be of items stolen from the store but of bags stolen from another customer, which would likely contain proper receipts. A reasonable officer investigating theft, therefore, may seek to interview store associates and may attempt to determine whether any customers had lodged a complaint of theft before releasing the suspect, which are processes that could reasonably require moving the suspect to another location.

The record, however, does not reflect counsel's contention that Jenkins actually suspected theft. Rather, Jenkins testified at his deposition that his *only* suspicion was of shoplifting, (J.A. at 788), that he did not take Karadi to the security office for the purpose of interviewing other associates or customers, (J.A. at 787), and that his investigation of his suspicion consisted solely of comparing Karadi's receipts with her purchases, (J.A. at 805, Appellant's Br. at 12). Thus, based upon Jenkins's testimony, we reject counsel's attempt to characterize Jenkins's suspicion as one of theft and agree with the district court that the purpose of Jenkins's investigatory stop was solely to confirm or dispel his suspicion that Karadi had shoplifted merchandise from Dillard's.

In light of Jenkins's suspicion of shoplifting, the record does not support a finding that the investigation would be furthered by moving

Karadi to Dillard's security office. Upon Jenkins's approach, Karadi offered her bags and receipts for comparison. As opposed to a suspicion of theft, a suspicion of shoplifting can be wholly dispelled by quickly comparing the receipts to the merchandise. In conducting a *Terry* stop, it is well-established that the "investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Royer*, 460 U.S. at 500. Because Jenkins suspected only shoplifting and Karadi offered her receipts and merchandise for inspection, examining the receipts without moving Karadi would have been the least intrusive means of investigation. Accordingly, we do not believe Jenkins's suspicion of shoplifting, without more, justified moving Karadi to the store's security office.

Jenkins next argues that moving Karadi was justified under *Royer* because doing so served the legitimate law enforcement purpose of preventing a public disturbance. To evaluate these events from a reasonable officer's perspective, as we must, *see Graham v. Connor*, 490 U.S. 386, 396 (1989), we find it necessary to acknowledge the escalating tension between Karadi and Sund at the time Jenkins intervened.[5] Karadi admits to being upset and possibly to using a loud voice at the time Sund and Jenkins approached her.[6] She also admits that both Jenkins and Sund asked her to explain what had taken place, but instead of providing such an explanation, she continued to demand to see a manager and to have her bags searched. We need not delve into the minutiae of the incident to determine, based upon Karadi's own testimony, that she was being, at least to some degree, belligerent and hostile. Jenkins could have reasonably perceived that he was involved in a tense situation that had the potential to escalate quickly. Moreover, at the time Jenkins approached Karadi, Sund had

---

[5]As the district court noted, the exact nature of Karadi's interaction with Sund is a matter of disagreement between the parties, with Jenkins alleging that Karadi was shaking her finger in Sund's face and threatening Sund. Karadi disputes that she shook her finger in Sund's face or otherwise threatened Sund. We take the interaction into account only to the extent that facts regarding it are undisputed.

[6]Karadi's contention at oral argument that she did not become upset until Jenkins touched her is disproved by her deposition testimony. (*See* J.A. at 284.)

told him that she needed his assistance because the situation "may be going bad." (J.A. at 764.) Thus, Jenkins approached Karadi with the belief that the situation was likely to become hostile, and his belief immediately was verified by Karadi's demeanor.

Preserving the public peace unquestionably is a legitimate law enforcement function. *See City of Chicago v. Morales*, 527 U.S. 41, 106-07 (1999) (Scalia, J., dissenting) ("Police officers are not, and have never been, simply enforcers of the criminal law. They wear other hats — importantly, they have long been vested with the responsibility for preserving the public peace.") (citing O. Allen, *Duties and Liabilities of Sheriffs* 59 (1845) ("As the principal conservator of the peace in his county, and as the calm but irresistible minister of the law, the duty of the Sheriff is no less important than his authority is great")); *McMillian v. Monroe Co., Alabama*, 520 U.S. 781, 794 (1997) (noting that one of the historical functions of officers is to preserve the public peace). In fact, Jenkins was obligated by North Carolina law to maintain the public peace. *See State v. Gaines*, 421 S.E.2d 569, 574-75 (N.C. 1992) (noting that North Carolina law enforcement officers have the duty to keep the peace at all times, whether on or off duty).

The precise facts of the interchange are largely irrelevant because Karadi admits, at the very least, that a tense, somewhat hostile scene was unfolding at the time of Jenkins's approach. Unlike the district court, we believe that this characterization of the interaction between Sund and Karadi is relevant to a reasonable officer's perspective and hold that Jenkins acted reasonably by deciding to move Karadi away from the middle of the store to a more private location within the store in an attempt to preserve the public peace and question her in private. Accordingly, we conclude that Jenkins acted constitutionally when he moved Karadi to the security office for the legitimate law enforcement purpose of preventing a public disturbance.[7]

---

[7]Even assuming that moving Karadi to another location within the store was a violation of the Fourth Amendment, Jenkins is entitled to qualified immunity because clearly established federal law does not prohibit moving a suspect to another location during an investigative detention for the legitimate law enforcement purpose of preserving the public

III.

Having determined that Jenkins's investigatory detention of Karadi was constitutional both in its inception and scope, we turn to the remainder of Karadi's constitutional claims to determine whether Jenkins is entitled to summary judgment on his qualified immunity defense.

A.

Karadi first argues that Jenkins used excessive force by "grabbing" her arm to compel her to move from the middle of the store after Karadi refused his request that she move. Because we have concluded that moving Karadi to the store's security office was within the scope of Jenkins's lawful *Terry* stop, Jenkins had the right to use force to compel Karadi to move. *See Graham*, 490 U.S. at 396 ("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."). Karadi admits that Jenkins initially did not use any force; instead, he requested that she follow him. Karadi testified, however, that she refused to follow Jenkins on her own free will. Therefore, we conclude that Jenkins acted lawfully by grabbing Karadi's arm for the purpose of effectuating his investigative detention.

Karadi next argues that Jenkins escalated his use of force in a manner contrary to her Fourth Amendment right to be free from excessive

---

peace. *See Florida v. Royer*, 460 U.S. 491, 505 (1983) (noting that an officer may move a suspect during a *Terry* investigation if moving her serves a "legitimate law enforcement purpose" and leaving undefined the scope of a "legitimate law enforcement purpose"). Because *Royer* left open the question of the scope of the law enforcement purpose that can support moving a suspect, we cannot say that it was clearly established that an officer could not move an individual to a more private area during an investigatory detention when attempting to preserve the public peace. *Cf. United States v. Manbeck*, 744 F.2d 360, 377-78 (4th Cir. 1984) (finding no Fourth Amendment violation when officers moved an individual from his car to the patrol car for an investigatory detention due to legitimate safety concerns).

force when he pushed her toward the security office, threatened her with mace, and twisted her arm behind her back and pushed her against a wall for the purpose of handcuffing her. The degree of force used is analyzed under the Fourth Amendment reasonableness standard. *See id.* at 395. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers" violates the Fourth Amendment. *Id.* at 396 (internal citation omitted). Indeed, "[t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. Force is not excessive if it is objectively reasonable under the circumstances facing the officer.

Because Karadi was lawfully detained, she was not justified in resisting Jenkins's lawful detention. *See* N.C. Gen. Stat. § 14-223 (making it unlawful to resist an officer in the discharge of his duties). Karadi does not dispute that she escalated her resistance to Jenkins's attempts to move her after he grabbed her arm by repeatedly pushing his hand off her arm in an effort to "get free of his grip." (J.A. at 288, 290-91.) At that point, Jenkins squeezed Karadi's arm and forcefully pushed Karadi away from the store exit towards the elevator in the Men's Department. We do not perceive Jenkins as having used more force than was necessary to overcome Karadi's admitted escalated physical resistance to the lawful detention. *See Graham*, 490 U.S. at 396-97 (noting that the reasonableness of the amount of force depends upon the facts and circumstances of each case, including whether the suspect resists the officer). Not only was handcuffing authorized attendant to Karadi's arrest for resisting an officer, as will be discussed further below, it was directly necessary to restrain Karadi's hands, in light of her repeated attempts to remove Jenkins's hand from her arm. Thus, as a matter of law, Karadi's allegations cannot support her excessive force claim because Jenkins's use of force was reasonable.

Similarly, although Karadi alleges that Jenkins insulted her with profanity in the course of the detention, such "undeniably deplorable and unprofessional behavior" does not rise to the level of a constitutional violation. *Carter v. Morris*, 164 F.3d 215, 219 n.3 (4th Cir. 1999) (noting that the use of racial epithets does not support an excessive force claim). Therefore, Jenkins is entitled to summary judgment on Karadi's claims of excessive force.

B.

We turn next to Karadi's allegation that Jenkins's investigatory detention was converted into an arrest in violation of the Fourth Amendment when he overcame her free will and moved her to the store's security office. A warrantless arrest is valid if the arresting officer has probable cause to believe the suspect has committed an offense. *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998). An officer's decision that probable cause is present is reviewed under a totality of the circumstances test. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983).

As we have discussed above, Jenkins's initial attempt to move Karadi was authorized within the scope of the investigatory detention; thus, the initial attempt did not constitute an invalid arrest. There is no dispute that after this initial attempt, the investigatory detention was converted into an arrest; the only dispute is whether the conversion was constitutional.

After the initial attempt to move Karadi was unsuccessful and Jenkins grabbed Karadi's arm, Karadi admits to resisting Jenkins's efforts to move her by attempting to brush his hand away multiple times to get free of his grip. Under North Carolina law, it is unlawful to "resist, delay or obstruct a public officer in discharging or attempting to discharge a duty of his office." N.C. Gen. Stat. § 14-223. This offense is not limited to resisting an arrest but includes any resistance, delay or obstruction of an officer in the discharge of *any* of his duties. *State v. Lynch*, 380 S.E.2d 397, 398-99 (N.C. Ct. App. 1989). Thus, at the point at which Karadi began resisting Jenkins's efforts to complete his lawful *Terry* investigation, Jenkins had probable cause to arrest Karadi for violation of North Carolina law. Accordingly, Jenkins is entitled to summary judgment on Karadi's claim of unlawful arrest under the Fourth Amendment.

IV.

Finally, Jenkins requests that we reverse the district court's denial of summary judgment in Jenkins's favor on Karadi's state law claims. The state law claims at issue are based upon gross negligence, false arrest and imprisonment, malicious prosecution, assault and battery,

and derivative liability. Our jurisdiction to consider appeals of the denial of qualified immunity on an interlocutory basis does not provide grounds for consideration of the supplemental state law rulings, unless the state law issues are: (1) "inextricably intertwined with the decision of the lower court to deny qualified immunity"; or (2) "consideration of the additional issue is necessary to ensure meaningful review of the qualified immunity question." *Taylor v. Waters*, 81 F.3d 429, 437 (4th Cir. 1996) (citing *Swint v. Chambers County Comm'n*, 514 U.S. 35, 51 (1995)).

Jenkins does not claim that Karadi's state law claims are inextricably intertwined or necessary to resolution of the qualified immunity issue. Additionally, the state law claims may prohibit behavior beyond that which is prohibited by the Constitution. For example, the validity of the state law claims is premised, in part, upon Jenkins's alleged violation of Dillard's store policies, which is irrelevant to a determination of qualified immunity on federal constitutional claims. *See Davis v. Scherer*, 468 U.S. 183, 194-95 (1984) (holding that the only relevant inquiry is whether rights under federal law have been violated). Thus, because the issue of whether the evidence was sufficient to raise a genuine issue of material fact on each of the elements of the state law causes of action diverges from the issue of whether Jenkins violated Karadi's federal constitutional rights, we lack jurisdiction to review the state law claims. *Taylor*, 81 F.3d at 437 (holding that state law claims of malicious prosecution and negligence were not inextricably intertwined with the decision of the lower court to deny qualified immunity with respect to a Fourth Amendment unlawful arrest claim). Because we have directed dismissal of all of Karadi's federal claims, however, we instruct the district court on remand to dismiss the state law claims without prejudice. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."); *Taylor*, 81 F.3d at 437 (directing dismissal of state law claims on remand after holding district court erred in failing to grant summary judgment to defendant in § 1983 claim on the basis of qualified immunity).

V.

In conclusion, we hold that Jenkins's seizure of Karadi complied with the Fourth Amendment in all respects. Accordingly, Jenkins is

entitled to summary judgment on his defense of qualified immunity with respect to Karadi's § 1983 claims. We direct the district court to enter judgment in favor of Jenkins as to Karadi's § 1983 claims and dismiss without prejudice the remaining state law claims.

*REVERSED AND REMANDED WITH INSTRUCTIONS*